No. 89-617

IN THE SUPREME COURT OF THE STATE OF MONTANA

1990

STATE OF MONTANA,

    Plaintiff and Respondent,

-vs-

RICKIE LEE CLELAND,

    Defendant and Appellant.



APPEAL FROM:    District Court of the First Judicial District,
In and for the County of Lewis and Clark,
The Honorable Thomas C. Honzel, Judge presiding.

COUNSEL OF RECORD:

    For Appellant:

        Edmund F. Sheehy, Jr.; Cannon & Sheehy, Helena,
        Montana

    For Respondent:

        Hon. Marc Racicot, Attorney General, Helena, Montana
        John Paulson, Assistant Attorney General, Helena,
        Montana
        Mike McGrath, County Attorney, Helena, Montana
        Lisa Leckie, Deputy County Attorney, Helena, Montana

Submitted on Briefs:    November 1, 1990

Decided:    December 31, 1990

Filed:

<span>_____</span>
Clerk

Justice Diane G. Barz delivered the Opinion of the Court.

Cleland appeals a jury decision of the District Court of the First Judicial District, Lewis and Clark County, finding him guilty of two felonies, theft and intimidation. We affirm.

Cleland presents two issues:

1. Was Cleland's conviction of intimidation invalid because the State failed to show the constitutionally required elements of § 45-5-203(1)(c), MCA?

2. Should Cleland's conviction be reversed because he was not represented by competent counsel?

I

Late in the evening of June 25, 1989, an imported French saxophone belonging to Joe Thompson, a teacher and part-time musician, was stolen from the Eagles building in Helena, Montana. The saxophone case and accessories, including microphones, were also taken. Thompson valued the saxophone, a rare model no longer manufactured, at $10,000 to $12,000. A local newspaper reported the theft, and Thompson placed an advertisement offering a reward and listing his telephone number.

On June 28, 1989, Thompson received a telephone call from a man who said that he had found the saxophone. Thompson offered the caller $250 for its return, but the caller wanted $1,500. Thompson told the man that he thought that he might be able to raise $500, and the caller promised to phone the following evening, requesting Thompson not to notify police.

2

However, Thompson reported the call to police who arranged for a trap, enabling the telephone company to quickly trace any incoming calls, to be placed on Thompson's phone. The police officers also arranged for calls to be tape-recorded. On the evening of June 29 Thompson received a second call. The caller threatened to destroy the saxophone if Thompson did not pay $500 or if the police became involved. He instructed Thompson to meet him near Vigilante Stadium and Helena Middle School.

While the call was in progress, the telephone company traced it to a pay phone on the corner of Montana Avenue and Prospect Avenue in Helena. An officer drove to the location and observed a man in red shorts and a white t-shirt using the telephone. The officer then drove to the stadium to monitor the electronic transmitter Thompson was given to wear during the exchange. At the stadium Cleland, dressed in red shorts and a white t-shirt, approached Thompson's truck from some bushes carrying the saxophone case and wearing a sock on his hand. Cleland climbed into Thompson's truck, gave Thompson the saxophone case containing the saxophone, and took the money. As Cleland was counting the money, the officer came up to the truck and placed Cleland under arrest.

Subsequently, on two separate occasions, a police officer went to the apartment where Cleland had been living and obtained consent from a woman who was just moving into the apartment to search the premises. The officer recovered some of the missing microphones and a piece of Thompson's saxophone wrapped in a sock matching the one Cleland had on his hand when he was arrested. At trial

Cleland's counsel objected to the searches on the ground that the officer had not ascertained whether the woman who agreed to the search had authority to consent since she was just moving into the apartment.

Witnesses placed Cleland at the Eagles during the evening of June 25. One witness testified that Cleland left after the band quit playing and that he later saw Cleland at his mother's house nearby with a large object in his hands.

The jury delivered a guilty verdict from which Cleland appeals.


## II

Was Cleland's conviction of intimidation invalid because the State failed to show the constitutionally required elements of § 45-5-203(1)(c), MCA?

Cleland contends that his conviction is invalid because the State failed to establish the constitutional requirement of circumstances which reasonably tended to produce a fear that his threat would be carried out. Cleland was convicted of intimidation, a felony, pursuant to § 45-5-203(1)(c), MCA.

An earlier version of this statute was declared unconstitutional by the Ninth Circuit Court of Appeals in Wurtz v. Risley (9th Cir. 1983), 719 F.2d 1438, on the ground that the statute was overbroad and impermissibly impinged upon First Amendment expression. The Court of Appeals found that the statute regulated pure speech, rather than conduct, and stated:

4

It is true that threats have traditionally been punishable without violation of the first amendment, but implicit in the nature of such punishable threats is a reasonable tendency to produce in the victim a fear that the threat will be carried out. (Citations omitted.) Section 203(1)(c) is not so limited. It is possible by judicial construction to read an element of instilling fear into the term 'threat,' id., but the Supreme Court of Montana has imposed no such narrowing construction upon section 203(1)(c). "[A] statute . . . which makes criminal a form of pure speech, must be interpreted with the commands of the First Amendment clearly in mind."

Wurtz, 719 F.2d at 1441 (quoting Watts v. United States (1969), 394 U.S. 705, 707, 89 S.Ct. 1399, 1401, 22 L.Ed.2d 664, 667 (per curiam)). The Wurtz Court also questioned the type of criminal conduct threatened, which at that time was "any criminal offense," declaring that it should not be a felony to threaten minor infractions.

In 1985 the Montana Legislature amended the statute to conform to the requirements of Wurtz by adding the phrase, "under circumstances which reasonably tend to produce a fear that it will be carried out" and by changing "commit any criminal offense" of the former version to "commit any felony." The current statute under which Cleland was convicted reads:

A person commits the offense of intimidation when, with the purpose to cause another to perform or to omit the performance of any act, he communicates to another, under circumstances which reasonably tend to produce a fear that it will be carried out, a threat to perform without lawful authority any of the following acts:

. . .

(c) commit any felony.

Section 45-5-203(1)(c), MCA.

Since the federal court's decision in Wurtz, we have examined

5

this same statutory provision, § 45-5-203(1)(c), MCA, and other portions of the intimidation statute. See State v. Hembd (1989), 235 Mont. 361, 767 P.2d 864; State v. Lance (1986), 222 Mont. 92, 721 P.2d 1258; State v. Ferrel (1984), 208 Mont. 456, 679 P.2d 246. In Ferrel, we reversed a conviction of intimidation pursuant to § 45-5-203(1)(c), MCA, on the ground that the defendant's verbal threat that she would keep proceeds of a check belonging to her employer until he had paid her the value of a garden that she had planted did not reasonably tend to produce fear in the victim that the threat would be carried out. Based on the Court of Appeals decision in Wurtz, the defendant was not guilty of conduct which could be constitutionally punished. Ferrel, 208 Mont. at 461-62, 679 P.2d at 227-28.

In Lance we found constitutional subsection (b) of § 45-5-203(1), MCA, which prohibits threats to subject persons to physical confinement or restraint. The defendant had written letters to various public officials and others threatening to take a hostage for the purpose of focusing public attention on his divorce settlement. Using a test enunciated in recent United States Supreme Court decisions that "'a law should not be invalidated for overbreadth unless it reaches a substantial number of impermissible applications,'" rather than the test applied in Wurtz, we found no First Amendment violation. Lance, 222 Mont. at 100-102, 721 P.2d at 1264-65 (citing New York v. Ferber (1982), 458 U.S. 747, 771, 102 S.Ct. 3348, 3362, 73 L.Ed.2d 1113, 1132). The United States Supreme Court has recently reaffirmed its reliance on the "real and

6

substantial" test for First Amendment overbreadth issues in Osborne v. Ohio (1990), ___ U.S. ___, 110 S.Ct. 1691, 1697, 109 L.Ed.2d 98, 111. In Lance we held that, as applied to the defendant, the statute was constitutional even though the threats constituted pure speech without any requirement of an overt act. Lance, 222 Mont. at 101-104, 621 P.2d at 1265-67.

In the case under consideration, we find that circumstances reasonably tended to produce a fear that Cleland's threats would be carried out. At trial the jury heard the taped conversation between Thompson and Cleland and had a typed transcript of the conversation to follow as they listened to the tape. Cleland states on the tape:

> And there better be no kind of cops, no f____ detectives, no unmarked cars, nobody else f____ come around 'cuz if you do that hey you might as well forget the whole f____ thing man I'm gonna smash it up so nobody knows what happened to it and where it's gone, do you hear me?

Cleland later repeats his threat:

> I said two thousand last night and I agreed with you for five hundred dollars, now you're f____ putting me off and you ask me a bunch of questions. I don't know if you're getting me set up or not. Hey m_____ you get me set up right now you know what . . . you lost every f____ thing 'cuz I don't have it with me I'm making a run.

At another point Cleland said:

> Like I say I'll show you the part I've taken out of there you ain't gonna see me m_____. I don't want you looking at me and I don't want you saying asking me who I am. If you try to f___ swing on me and f___ me up m_____, hey you're gonna lose it hear me?

During the course of the conversation, Cleland makes several other similar threats. Cleland also reveals on the tape that he

7

understood the value of the saxophone to Thompson, which he had read about in the newspaper.

Cleland threatened Thompson with felony criminal mischief which consists of purposely or knowingly damaging or destroying without consent property of another exceeding $300 in value. Section 45-6-101, MCA. As we stated in Lance, "'[w]hat is a threat must be distinguished from what is constitutionally protected speech.'" Lance, 222 Mont. at 104, 721 P.2d at 1266 (quoting Watts, 394 U.S. at 707, 89 S.Ct. at 1401, 22 L.Ed.2d at 667). Threats made in jest or political hyperbole are not punishable under the statute. "[C]austic, abusive, and robust speech is fully protected until it rises to the level of threats which cause harm to society." Lance, 222 Mont. at 105, 721 P.2d at 1267. The question of whether an intention to commit a felony is present must be decided on the basis of an objective standard, and "whether a statement constitutes a true threat is to be determined by the trier of fact." Lance, 222 Mont. at 104, 721 P.2d at 1267 (citing United States v. Kelner (2d Cir. 1976), 534 F.2d 1020 and United States v. Merrill (9th Cir. 1984), 746 F.2d 458).

The language on the tape made it clear what Cleland intended. We find that the circumstances under which Cleland voiced his threats to Thompson--his demand for more money, his possession of the saxophone which made his threats to destroy or otherwise dispose of the instrument plausible, and his forceful manner-- reasonably tended to produce a fear that the threats would be carried out. We hold that Cleland's conviction pursuant to § 45-

8

5-203(1)(c), MCA, does not violate constitutional principles of free speech.

III

Should Cleland's conviction be reversed because he was not represented by competent counsel?

Cleland claims that he was deprived of his Sixth Amendment right to counsel because his appointed lawyer did not adequately defend him. Specifically, he alleges the following: (1) his counsel did not raise the issue of the constitutionality of the intimidation statute as applied to him; (2) his counsel failed to file a pre-trial motion to suppress the evidence obtained in the searches of the apartment; and (3) Cleland was requested to sign a letter prepared by counsel "trying to force his client to accept a plea bargain and to basically exonerate counsel for Cleland with regard to his representation."

In evaluating whether defendant received competent assistance of counsel, we apply the two-part test enunciated in the seminal case of Strickland v. Washington (1984), 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

Strickland, 466 U.S. at 687, 104 S.Ct. at 2064, 80 L.Ed.2d at 693;

9

see State v. Johnstone (Mont. 1990), 798 P.2d 978, 987, 47 St.Rep. 1715, 1726; State v. Albrecht (Mont. 1990), 791 P.2d 760, 764, 47 St.Rep. 805-806. As is evident, the burden is heavy on one who seeks to reverse a judgment on the basis of ineffective assistance of counsel. State v. LaValley (1983), 203 Mont. 393, 398, 661 P.2d 869, 872. "[T]he proper standard for attorney performance is that of reasonably effective assistance." Strickland, 466 U.S. at 687, 104 S.Ct. at 2064, 80 L.Ed.2d at 693. Reasonably effective assistance does not mean that the defendant is guaranteed an acquittal. The defendant must show that the errors allegedly committed stem from neglect or ignorance, rather than informed professional judgment. State v. Robbins (1985), 218 Mont. 107, 113, 708 P.2d 227, 231. Moreover, "any alleged error by defense counsel must be shown to prejudice the defendant before reversal will be warranted." State v. Hurlbert (1988), 232 Mont. 115, 120, 756 P.2d 1110, 1113. With these guidelines in mind, we examine Cleland's allegations.

First, Cleland claims that his appointed attorney failed to challenge, on constitutional grounds, sufficiency of the evidence in regard to the charge of intimidation. As addressed above, we find no merit to Cleland's constitutional claim. His appointed lawyer's failure to bring it to the attention of the trial court did not prejudice Cleland nor deprive him of a fair trial.

Secondly, Cleland alleges that his appointed counsel failed to file a pre-trial motion to suppress the evidence obtained from the apartments. Cleland correctly asserts that a motion to

10

suppress evidence "shall be made before the trial unless for good cause shown the court shall otherwise direct." Section 46-13-301, MCA. While Cleland's appointed counsel did not file a written motion, he raised the issue orally prior to trial, and the court gave permission to bring a motion at trial when the State moved to offer the items seized during the search into evidence. During the trial, Cleland's appointed counsel objected to the admission of the seized items into evidence on the ground that the person who consented to the searches had no authority to grant permission. The court overruled the objection after hearing the officer's testimony that he had ascertained the consenting person's occupancy of the apartment before he obtained written consent.

While we agree that Cleland's appointed attorney should have filed a pre-trial motion to suppress the evidence within the time limits required by § 46-13-301, MCA, we do not find that the result of the trial would have been changed. Cleland asserts that if the issue had been properly raised before trial, it is "conceivable" that the District Court would have suppressed the evidence, and "Cleland could have legitimately argued that he had found the saxophone," rather than have stolen it. Thus, Cleland could have raised a reasonable doubt of whether he was guilty of theft.

Whether a party other than the defendant may consent to a warrantless search has been addressed previously in State v. Sorenson (1979), 180 Mont. 269, 590 P.2d 136. In holding that the mother of the defendant, who was caring for houseplants and animals of a vacationing neighbor, had no authority to allow a warrantless

11

search of the neighbor's residence, we relied upon United States v. Matlock (1973), 415 U.S. 164, 94 S.Ct. 988, 39 L.Ed.2d 242. In Matlock, the United States Supreme Court recognized the rule that the prosecution "may show that permission to search was obtained from a third party who possessed common authority over . . . the premises or effects sought to be inspected." Matlock, 415 U.S. at 171, 94 S.Ct. at 993, 39 L.Ed.2d at 250. The Supreme Court further noted that common authority is not premised on property law:

> [Authority to consent] rests rather on mutual use of the property by persons generally having joint access or control for most purposes, so that it is reasonable to recognize that any of the co-inhabitants has the right to permit the inspection in his own right and that the others have assumed the risk that one of their number might permit the common area to be searched.

Matlock, 415 U.S. at 171 n. 7, 94 S.Ct. at 993, 39 L.Ed.2d at 250. The Supreme Court has recently extended the Matlock holding by ruling that a warrantless search is valid when based upon the consent of a third party whom the police, at the time of entry, reasonably, though erroneously, believed to have authority to consent. Illinois v. Rodriguez (1990), ___ U.S. ___, 110 S.Ct. 2793, 111 L.Ed.2d 148.

The likelihood is small that the District Court would have suppressed the evidence obtained in the searches if a pre-trial suppression hearing had been held. Cleland's suppositions that obtaining a pre-trial suppression hearing would change the outcome of the trial are groundless.

Finally, Cleland claims that a letter his appointed counsel asked him to sign was an effort to force him to accept a plea

12

bargain and to exonerate him from liability for his representation of Cleland, in violation of Rule 1.8(h) of the Rules of Professional Conduct, which provides in part:

> A lawyer shall not make an agreement prospectively limiting the lawyer's liability to a client for malpractice unless permitted by law and the client is independently represented in making the agreement . . . .

Cleland further contends that his refusal to sign the letter prompted his counsel to provide an inadequate defense. The State responds that the letter is not part of the record and should not be considered on appeal. "Allegations of ineffective assistance of counsel must be grounded on facts which appear in or are easily deduced from the record and which go beyond mere conclusory allegations." State v. Tome (1987), 228 Mont. 398, 403, 742 P.2d 479, 482. Cleland claims that matters relating to the Rules of Professional Conduct come within the scope of the Supreme Court's original jurisdiction "since it pertains to the conduct of an attorney and this Court always governs the conduct of attorneys within the State of Montana."

While the Supreme Court has exclusive authority over the admission of attorneys to the bar and regulation of attorneys within Montana, Kradolfer v. Smith (Mont. 1990), ___ P.2d ___, 47 St.Rep. 1861, 1863; Harlen v. City of Helena (1984), 208 Mont. 45, 49-50, 676 P.2d 191, 193, this action is not a disciplinary proceeding in which violation of the Rules of Professional Conduct is at issue. Cleland's allegation that his refusal to sign the letter led to neglect by his appointed counsel is without foundation in the record.

13

Viewed in their entirety, Cleland's allegations of inadequate representation by his appointed counsel do not reach constitutional magnitude. Cleland's appointed counsel had not "made errors so serious that counsel was not functioning as the 'counsel' guaranteed by the Sixth Amendment." We hold that Cleland was not deprived of a fair trial due to ineffective assistance of counsel.

Affirmed.

_____
Justice

We concur:

_____
_____
_____
_____
Justices

14